**MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, Plaintiff,**

v.

**UNITED STATES of America, U.S. Army Corps of Engineers, and COL. Joe Miller, District Engineer, Jacksonville District, Corps of Engineers, in his official capacity; and Michael Davis, Deputy Assistant Secretary of the Army, in his official capacity, Defendants.**

No. 00–0033–CIV.

United States District Court, S.D. Florida.

Feb. 28, 2003.

Robert F. Cusumano, James G. Gamble, Alex L. Wang, Simpson Thacher & Bartlett, New York, NY, Richard Joseph Grosso, Fort Lauderdale, Bradford H. Sewell, Natural Resources Defense Council Inc, New York, NY, for Miccosukee Tribe of Indians of Florida, a federally-recognized Indian Tribe, Dade County Farm Bureau, a Florida Limited Agricultural Association, Brooks Tropicals, Inc., a Florida corporation, Dimarie Homestead, Inc., a Florida corporation, James S. Humble, Hector Varella, plaintiffs.

Mark A. Brown, United States Department of Justice, Wildlife & Marine Resouces Section, Washington, DC, Michael A. Gheleta, United States Department of Justice, Environmental & Natural Resources, Denver, CO, John Brady, U.S. Army Corps of Engineers, Jacksonville, Jason T. Cohen, United States Attorney's Office, Wildlife & Marine Resources Section, Washington, DC, for United States of America, United States Army Corps of Engineers, Michael Davis, Deputy Assistant Secretary of the Army, in his official capacity, James G. May, Colonel, District Engineer, U.S. Army Corps of Engineers, Federal Defendants', defendants.

## ORDER ADOPTING MAGISTRATE'S REPORT AND RECOMMENDATION

K. MICHAEL MOORE, District Judge.

**THIS CAUSE** came before the Court upon Federal Defendants' Cross Motion for Summary Judgment (**DE # 71**).

**THE MATTER** was referred to the Honorable John J. O'Sullivan, United States Magistrate. A Report and Recommendation dated December 15, 2002 has been filed, recommending that the case be dismissed. It appears from a review of the record that the Plaintiffs filed written objections to the Report and Recommendation on December 30, 2002.

After due and proper consideration of all portions of this file deemed relevant to the issues raised and a *de novo* determination of those portions of the recommendation to which objection is made, the recommendation of the Magistrate Judge made under 28 U.S.C. § 636(b)(1)(B) and dated December 15, 2002, is **ADOPTED** as the opinion of this Court. Accordingly, the Plaintiffs' objections are **OVERRULED**.

**FURTHER ORDERED** and based thereon, that Defendants' Motion for Summary Judgment (**DE # 71**) and Plaintiff's Motion for Summary Judgment (**DE # 242**) are **DENIED** as moot. The Clerk of the Court is directed to mark this case as **CLOSED**. All pending motions not otherwise ruled upon are **DENIED** as moot.

## REPORT AND RECOMMENDATION

O'SULLIVAN, United States Magistrate Judge.

THIS CAUSE came before the Court on Federal Defendants' Cross Motion for Summary Judgment (DE # 71, 1/05/01) and Plaintiff's Motion for Summary Judgment on Count II of Original Complaint (DE # 242, 7/3/02). These motions were

referred to the undersigned by the Honorable K. Michael Moore pursuant to 28 U.S.C. § 636. The undersigned heard oral argument on these motions on October 30, 2002. Upon a review of the motions, the responses, and the replies thereto, the voluminous court file and administrative record, oral argument and applicable law, the undersigned respectfully **RECOMMENDS** that the case be **DISMISSED**. Federal Defendants' Cross Motion for Summary Judgment (DE # 71) and Plaintiff's Motion for Summary Judgment on Count II of Original Complaint (DE # 242) and all other pending motions should be **DENIED** as moot.[1]

## INTRODUCTION

In this case, the plaintiff Miccosukee Tribe (the "Tribe") challenges a series of water management decisions by the U.S. Army Corps of Engineers (the "Corps") designed to avoid jeopardy to the endangered Cape Sable Seaside Sparrow ("Sparrow") in the Everglades National Park while administering a number of Congressionally-authorized programs aimed at balancing the water-related needs of South Florida. Specifically, the Tribe challenges the implementation of the "Interim Structural and Operational Plan for Hydrologic Compliance with the Cape Sable Seaside Sparrow Biological Opinion for the Year 2000" (the "ISOP"). A.R. 655. In addition, the Tribe filed a Supplemental Complaint in this case challenging the implementation of the "ISOP 2001," which essentially continued implementation of the ISOP throughout the year 2001 and through a substantial portion of 2002. The ISOP and ISOP 2001 were designed to reduce the risk of the

Sparrow's extinction due to its reproductive failure. Successful Sparrow breeding depends heavily on the amount of water present in Sparrow habitat during its nesting season. The ISOP and ISOP 2001 had the practical effect of drying Sparrow nesting habitat in the western portion of the Everglades and increasing water levels in the Sparrow habitat in the eastern portion of the Park. Whatever beneficial impact the ISOPs may or may not have had on the Sparrow, the Tribe alleges that the ISOP and ISOP 2001 caused sustained high water levels in an area called Water Conservation Area 3A and thus adversely affected the Tribe's lands and its way of life.

## PROCEDURAL HISTORY

The case has a lengthy and complex procedural history. The Tribe filed its Original Complaint in January of 2000 and then filed a second, Supplemental Complaint in November of 2001. Over the course of this litigation, the parties have filed notices and motions so voluminous as to produce a docket nineteen (19) pages long.

The Tribe filed their Original Complaint challenging the ISOP on January 5, 2000, shortly after the plan's emergency development and implementation. Briefly, the Tribe alleges that in implementing the ISOP, the defendants violated: the National Environmental Policy Act ("NEPA")[2] (Count I), the rulemaking and agency action requirements of the Administrative Procedure Act ("APA")[3] (Counts II and VI); the Endangered Species Act ("ESA")[4] (Count III); the rules governing the Central and South Florida Project

---

1. Because the undersigned concludes that the case is moot and therefore should be dismissed, the undersigned will omit a discussion of the appropriate standard of review and the summary judgment procedure.

2. 42 U.S.C. §§ 4321 *et seq.*

3. 5 U.S.C. §§ 551 *et seq.*

4. 16 U.S.C. §§ 1531 *et seq.*

(Count IV); the Indian Trust Doctrine (Count V);[5] and the Fifth Amendment guarantee of Due Process(Count VII). Following implementation of ISOP 2001, on November 6, 2001, the Tribe filed a Supplemental Complaint challenging the new water deviation on the same grounds.[6] As a whole, the Tribe's claims in each complaint focus on alleged injuries they have suffered due to the effects of ISOP and ISOP 2001 on the water levels in Water Conservation Area 3A ("WCA 3A").

The defendants first briefed their motion for summary judgment on all of the Tribe's claims concerning the ISOP in January, 2001(DE # 71, 1/05/01). Since that time, the Court has adopted Reports & Recommendations by the undersigned concerning the Tribe's National Environmental Policy Act ("NEPA") claims and the issue of standing. In addition, the Tribe filed three motions for preliminary injunction, each of which the Court has denied. At this juncture in the litigation, the defendants maintain that the Tribe's claims are ripe for summary judgment based on the record before the Court. The defendants filed their Amended Memorandum in Support of Cross Motion for Summary Judgment (DE # 239, 6/13/02) advancing their arguments with respect to both the Original and Supplemental Complaints. The Tribe opposes the defendants' motion and, in addition, moves for summary judgment in its favor on Count II of the Original Complaint (DE # 242, 7/3/02). The defendants filed their Amended Reply Memorandum in Support of Cross Motion for Summary Judgment (DE # 243) on July 12, 2002 and the plaintiff filed its Reply on Amended Cross Motion for Summary Judgment on Count II of Original Complaint (DE # 246) on July 26, 2002. Oral argument concerning the motions took place during a hearing before the undersigned on October 30, 2002.

## FACTS

### A. The Central and Southern Florida Project

This case concerns the ongoing Central and Southern Florida Project for Flood Control and Other Purposes ("C & SF Project"), a multi-purpose water management project authorized by Congress in 1948. The C & SF Project provides both flood protection and water supply for the developed areas of South Florida. Consisting of thousands of miles of levees and canals and numerous water control structures across South Florida, the C & SF Project is operated by the Corps and its local sponsor, the South Florida Water Management District ("SFWMD"). A.R. 663 at 1–25 to 1–28. Together, the Corps and the SFWMD operate the C & SF structures and components pursuant to water regulation schedules. These schedules guide water managers charged with regulating inflow and outflow of water through the various water control structures by setting both maximum and minimum water levels for any given month. Pursuant to its regulations, the Corps is permitted to deviate from the water regulation schedule under appropriate circumstances.

Two portions of the overall C & SF project are at issue in this case—Water Conservation Area 3A and the South Dade Conveyance System. WCA 3A is located in Miami–Dade and Broward Counties. WCA 3A receives water from the north through water control structures, in partic-

---

**5.** Before the Federal defendants filed their cross motion for summary judgment, the Court dismissed Count V of the plaintiff's original complaint (DE # 63, 1/08/01).

**6.** Each of the counts in the Supplemental Complaint corresponds directly with those in the Original Complaint.

ular the S–11 structures. Other structures, including the S–12 structures, permit water to flow south from WCA 3A into northern portions of the Everglades National Park (the "Park"). The southward-traveling waters flow through the Shark Slough to the Florida Bay.

The South Dade Conveyance System (SDCS) consists of a series of canals, levees and water control structures found east of the Park. The SDCS' primary operations drain water from agricultural areas of southern Miami Dade and send the water either to the Biscayne Bay or to the southernmost area of the county through the C–111 canal. See A.R. 645, at 1–6 to 1–11; A.R. 663, at 3–18 to 3–19.

*B. The Modified Water Deliveries Project & the Environmental Impacts of Test 7*

Over the years, the Corps and other interested parties have noted that the C & SF Project has had some unanticipated environmental consequences that have degraded the ecology of the Park. These include higher water levels in the western half of the park than in the eastern half (which is the opposite of natural conditions) and the drainage of marsh in the eastern half of the park. In response to these impacts, in 1984, Congress authorized the Corps, SFWMD and the National Park Service to experiment with different methods of delivering water to the Park via the "Experimental Program of Water Deliveries to the Everglades National Park" ("Experimental Program"). Pub.L. No. 98–181, § 1302, 97 Stat. 1292–93 (Nov. 30, 1983). Several years later, in 1989, Congress authorized the "Modified Water Deliveries Project" ("MWD Project") which calls for construction of new water control structures to the north of the Park. The new structures are intended to better distribute waters between the Northeast and North West Shark Slough area of the Park. Pub.L. No. 101–229, 103 Stat.1946 (Dec. 13, 1989)(codified at 16 U.S.C. § 410r–5 tp 410r–8).

Following their additional authorization under the Experimental Program, the Corps and other agencies operated seven different test water delivery methods and studied their impacts on the Park's ecology. The seventh and final test, aptly named "Test 7," created the conditions within the Park that have brought this case before the Court. Test 7 governed water delivery methods in and to the Park from roughly 1995 to 1999. Twice during that period, pursuant to the Endangered Species Act,[7] the U.S. Fish and Wildlife Service ("USFWS") initiated consultation with the Corps concerning the consistently negative effects of Test 7 on the Sparrow population. By 1999, breeding conditions for the Sparrow were so dire that USFWS asked the Corps to take special measures with respect to the Spring 1999 Sparrow nesting season. A.R. 919A, at EA–1; A.R. 919B. Specifically, the USFWS sought to have the Corps reduce water levels in the Sparrow's western nesting habitat in order to increase the probability of successful breeding for that year. The Corps then requested and received approval from the Council on Environmental Quality ("CEQ") for emergency alternative arrangements pursuant to NEPA and deviated from its Test 7 operations. A.R. 655, App. A.

In February 1999, USFWS issued a Final Biological Opinion ("BO") on the effects of the Test 7 and other concurrent programs on several endangered species, such as the Wood Stork, the Snail Kite, and the Sparrow. A.R. 223. The most significant conclusion in the BO was that, although a full implementation of the Water Deliveries Project would avoid jeopardy to the Sparrow, the continued operation

7. 16 U.S.C. §§ 1531 et. seq.

of Test 7 in the interim placed the Sparrow in jeopardy of extinction. In keeping with that conclusion, the USFWS provided a "Reasonable and Prudent Alternative" ("RPA") identifying actions that the USFWS believed would avoid jeopardy to the Sparrow until such time as the MWD Project was complete. Upon review of the BO, the Corps was concerned about potential ancillary consequences of the RPA that were inconsistent with other aspects and goals of the various programs it administers. These ancillary consequences included potential flooding impacts on private property and other adverse environmental impacts beyond the Park's boundaries.

### C. The ISOP and ISOP 2001

In December 1999, in response to the BO and intervening emergency weather conditions caused by Hurricane Irene, the Corps issued the ISOP. A.R. 655. The ISOP directed closure of the S–12 structures along the southern boundary of WCA 3A and opening of the S–333 intake structure to move water from the WCA 3A to the eastern boundary of the Park through the SDCS. *Id.* At EA–9 to EA–10. The Corps sought and received emergency authorization from CEQ to prepare an Environmental Assessment pursuant to NEPA after the initial implementation of ISOP. CEQ's authorization established a deadline for completion of the final Environmental Assessment and directed preparation of a full Environmental Impact Statement ("EIS") for a new longer term plan, the "Interim Operating Plan," that would be implemented in future years until completion and implementation of the MWD Project.

A draft EA for the ISOP issued on January 11, 2000. A final EA, which included the Tribes comments, issued on March 1, 2000. The EA predicted, based on modeling, that water levels in WCA 3A would be increased, and the Tribe alleges that this has been the case. In December 2000, in consultation with CEQ, the Corps issued the revised and updated ISOP 2001, which essentially continued implementation of the ISOP due to delay of the IOP development process. ISOP 2001 differed most significantly from ISOP in establishing closure of the S–12A structure one month earlier than the previous year.[8] In the meantime, consultation among the Corps, USFWS, SFWMD and others continued concerning ongoing steps to avoid jeopardy to the Sparrow. At the recommendation of the CEQ, this consultation took the form of mediation under the auspices of the U.S. Institute for Environmental Conflict Resolution.

### D. The Interim Operating Plan for Protection of the Cape Sable Seaside Sparrow (the IOP)

In February 2001, the Corps issued a draft EIS ("DEIS") on the IOP. One of the alternatives analyzed under the DEIS is the ISOP 2001. Following its issuance, the Corps solicited comments from the public and received comments from the Tribe. Public reception of the DEIS led to another round of mediation before the U.S. Institute for Environmental Conflict Resolution, with a new focus on SFWMD concerns about meeting the non-environmental water-related needs of South Florida. As a result of the mediation, in October 2001, the Corps issued a supplemental draft EIS ("SDEIS") that described a new alternative, "Alternative 7," to ISOP 2001. Alternative 7 was largely based on ISOP 2001 but added several new elements to meet SFWMD's concerns.

Again, the Corps took public comments on the SDEIS in the fall of 2001. Several

---

8. CEQ admonished the Corps that if timing for publication of the draft EIS for IOP slipped further than the intended February 2001 date the Corps would be required to update the March 2000 EA on ISOP.

commenters expressed concern regarding flood control of the residential and agricultural areas adjacent to the park, which in turn led SFWMD to withdraw its support for Alternative 7 as an IOP. Once more, the Corps, USFWS, Everglades National Park and the SFWMD resumed mediation and developed "Alternative 7R" to protect the Sparrow while advancing the other goals of the MWD Project. Alternative 7R is based on Alternative 7 but apparently modifies it by incorporating pre-storm drawdown and post-storm recovery operations and by incorporating the use of structures and features previously approved pursuant to ongoing projects.

In late April 2002, the Corps issued a Final EIS ("FEIS") for the IOP. The FEIS evaluates Alternative 7R as the preferred alternative for the IOP but also includes an evaluation of ISOP 2001 as the "No Action Alternative." On July 3, 2002, the Corps issued a Record of Decision ("ROD") implementing Alternative 7R as the IOP. Since July 3, the IOP has been the operative plan for protection of the Sparrow.

## DISCUSSION

■ The Tribe requests both declaratory and injunctive relief from the defendants' alleged violations of federal law. Specifically, in the Original Complaint, the Tribe requests that the Court declare that the adoption of the ISOP plan and the actions taken by the Corps in accordance therewith were in violation of the law and that the ISOP is "null and void." *See* Original Complaint at ¶ s 87, 63, 77, 80, 89 and 93. Furthermore, the Tribe seeks an injunction prohibiting the implementation of the ISOP. *See id.* In its Supplemental Complaint, the Tribe's requests are phrased differently. There, the Tribe requests the Court declare and order that the Corps be enjoined from closing the S–12 gates and from taking any other "water deviation action in violation of the other-

wise lawful water control plan and regulation schedule for the WCA 3A." Supplemental Complaint at pp. 3–7. Keeping in mind that the ISOP and ISOP 2001 differ to the extent that ISOP 2001 calls for an earlier closure date for the S–12 structures than the original ISOP, the relief requested may be interpreted as an injunction prohibiting implementation of ISOP 2001 as well as a declaration that the ISOP 2001 is null and void.

The federal defendants argue that the Tribe's claims in both the Original and Supplemental Complaint are moot. They argue that as of July 3, 2002, the ISOP and ISOP 2001 are no longer in effect because they have been superseded and replaced by the IOP. The undersigned agrees.

The Corps's issuance of a ROD for the new water management plan, the IOP, moots all of the plaintiff's claims challenging the previous ISOP regime. Therefore, the Court has no jurisdiction to decide the case and it must be dismissed. A declaration by this Court at this stage that the ISOP was either adopted or implemented illegally would constitute an advisory opinion, which the federal courts are not empowered to provide. Moreover, because the ISOPs are no longer being implemented, the Tribe has already received the injunctive relief requested.

### A. The Doctrine of Mootness

■ The jurisdiction of the federal courts is limited to live "cases or controversies." U.S. Const. Art. III, § 2. If a case is truly moot, a federal court is without power to resolve the dispute between the parties. *Chamber of Commerce of the USA v. United States Dep't of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980). Put another way, the federal courts do not have jurisdiction to "give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case be-

fore it." *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Alabama Hospital Ass'n v. Beasley,* 702 F.2d 955, 961 (11th Cir.1983)(internal citations omitted). This Article III "live controversy" requirement "subsists through all stages of federal judicial proceedings, trial and appellate." *Horton v. City of St. Augustine Florida,* 272 F.3d 1318, 1326 (11th Cir.2001)(quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)). As such, it is entirely appropriate to examine whether the present case has become moot at this summary judgment stage of the proceeding.

The doctrine of mootness applies to the Tribe's claims for both injunctive and declaratory relief. *Nat'l Solid Waste Mgmt. Ass'n v. Alabama Dept. Of Envtl. Mgmt.,* 924 F.2d 1001, 1003 (11th Cir.1991). The court must "decide the appropriateness and the merits of the declaratory request irrespective of the [its] conclusion as to the propriety of the injunction." *Id.* The undersigned turns first to a discussion of the Tribe's request for injunctive relief, which the undersigned concludes is now moot in light of adoption of the IOP.

### 1. The Tribe's Request for Injunctive Relief

■ A party can have no legally cognizable interest in the outcome of the case if the court is not capable of providing any relief which will redress the alleged injury. *See Southern Utah Wilderness Alliance v. Smith,* 110 F.3d 724, 727 (10th Cir.1997). If an event occurs while a case is pending

that makes it impossible for the court to grant any relief to the prevailing party, the suit must be dismissed as moot. *Church of Scientology,* 506 U.S. at 12, 113 S.Ct. 447. For example, regulatory developments, such as the adoption of new or amended regulations, can moot a challenge to a regulation in its original form. *See Alabama Hosp. Ass'n,* 702 F.2d at 961; *Natural Resources Defense Council v. United States Nuclear Reg. Comm'n,* 680 F.2d 810, 814 (D.C.Cir.1982).

In this case, the Tribe asks the Court to enjoin the Corps from implementing the ISOP and ISOP 2001. The Tribe's challenge to the ISOPs rests largely on procedural grounds: the Corps's alleged failure to prepare a full EIS for each of the ISOPs; the Corps's alleged failure to consult adequately under the ESA; and the Corps's alleged failures to comply fully with the APA.

As of July 3, 2002, the ISOPs are no longer in effect. They no longer govern the protection of the Sparrow. As an initial matter, the Tribe has already received the relief requested in so far as the ISOPs are no longer being implemented by the Corps. More importantly, the Court no longer has any way of redressing the procedural failures or the substantive deficiencies associated with the defunct ISOPs. Cf. *Gulf of Maine Fisherman's Alliance v. Daley,* 292 F.3d 84 (2002)(holding challenge to fisheries management plan mooted by adoption of a new plan containing the same substantive provisions). Any procedural deficiency with respect to the ISOPs has been eliminated by the promulgation of the IOP.[9] In the instant case, there are no allegations with respect to the procedural or substantive deficiencies of the IOP. Furthermore, any challenged provisions of the ISOPs, such as the clo-

---

9. The undersigned notes that the plaintiff has filed a new lawsuit in the Southern District of Florida challenging the IOP on the same

grounds (and additional grounds) as those contained in the two complaints in this case. *See* 02–22778–CIV–Moore.

sure of the S–12 structures, that are still operative in the IOP have now been re-adopted after consideration of different data as part of a different (though certainly overlapping) administrative record. These provisions are properly reviewed by the court in a case challenging the IOP.

### 2. The Tribe's Request for Declaratory Relief

■ The federal courts may grant declaratory relief only in the case of an "actual controversy." *Burke v. Barnes*, 479 U.S. 361, 364, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987). A request for declaratory relief should be dismissed as moot if the challenged action has no continuing adverse effects on the parties. *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

The federal defendants assert that the Tribe has requested an impermissible advisory opinion. The Tribe argues that it does not seek an advisory opinion but "instead seeks a ruling on whether the Corps can continue to alter its operations and implement yearly deviations from a water control plan ... without following proper procedures." Plaintiff's Amended Reply Memorandum at 2. However, the Tribe's Original Complaint contradicts that argument—the Complaint asks the Court for a declaration that the ISOP was implemented in violation of federal law and that it is, therefore, "null and void." Original Complaint at ¶ 57, 63, 77, 80, and 90.

The undersigned returns to the fact that the Corps issued a ROD adopting the IOP on July 3, 2002. Although the IOP certainly appears to incorporate many elements of the ISOPs, which the Tribe alleges have harmed and continue to harm its interests, the IOP supercedes both the ISOP that prompted this litigation and the ISOP 2001 upon which the Supplemental Complaint was based. Thus, the ISOP

and ISOP 2001 are already of no further legal force and effect. They cannot be said to have a continuing adverse effect on the Tribe.

The adoption and implementation of the IOP moot any "live controversy" in the pending litigation. A declaration by this Court of the ISOP's and/or ISOP 2001's legality would "be nothing more than a gratuitous comment without any force or effect." *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir.1985). It would have no effect whatsoever on the IOP now in place. Such a declaration would constitute an impermissible advisory opinion. Thus, the Tribe's claim for declaratory judgment relief also fails to satisfy the threshold "case or controversy" requirement of Article III.

### 3. Capable of Repetition Yet Evading Review

■ The final determination the undersigned must make is whether the Tribe's claims remain actionable because they are "capable of repetition yet evading review." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). In order to qualify for this narrow exception to the mootness doctrine, the Tribe must show "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Gulf of Maine Fisherman's Alliance v. Daley*, 292 F.3d 84, 88–89 (1st Cir.2002).

Taking the second prong first, the Tribe argues that there is a reasonable expectation that it will be "subjected to the same action again" and that the Corps is likely to revert to its previous practices, namely deviations from water regulation schedules that have allegedly harmed the Tribe. The Tribe contends that the Corps has demonstrated itself to be a sort of serial offender with respect to adhering to its

water regulation schedules. The Tribe's argument is based on its characterization of the ISOPs as "deviations from the lawful Water Control Plan." But, a critical feature of the ISOPs, which the Tribe's characterization ignores, is that they were always intended to be short term interim plans operative only until such time as the IOP, a long term interim plan, was put into place pending completion of the MWD Project. The IOP is now in place. Neither the Administrative Record before the Court nor the representations of any of the parties indicate an intent to replace the IOP with another short term plan or demonstrate that the IOP will be operative for so short a time frame as to evade review. To the extent that the Tribe is still being harmed by those aspects of the ISOPs that have been re-adopted in the IOP, judicial review of the IOP is available. The Tribe's claims do not remain actionable under this narrow exception to the mootness doctrine.

### CONCLUSION

In accordance with the foregoing it is hereby

**RECOMMENDED** that the case be **DISMISSED**. Federal Defendants' Cross Motion for Summary Judgment (DE # 71) and Plaintiff's Motion for Summary Judgment on Count II of Original Complaint (DE # 242) and all other pending motions should be **DENIED** as moot. The parties may serve and file written objections to this Report and Recommendation with the Honorable Judge K. Michael Moore, United States District Judge, within ten (10) days of receipt. *See* 28 U.S.C. § 636(b)(1)(c); *United States v. Warren*, 687 F.2d 347, 348 (11th Cir.1982).

Dec. 15, 2002.