# United States Court of Appeals

## For the First Circuit

No. 00-1160

THE GULF OF MAINE FISHERMEN'S ALLIANCE,

Plaintiffs, Appellants,

v.

WILLIAM C. DALEY, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,

and Zobel,* District Judge.

Stephen M. Ouellette, with whom David S. Smith and Cianciulli & Ouellette were on brief, for appellant.

James C. Curden, Acting Assistant Attorney General, with whom Lyn Jacobs, James C. Kilbourne, Andrew Mergen, and M. Alice Thurston, Environment and Natural Resource Division, United States Department of Justice, were on brief, for appellee.

June 11, 2002

---

*of the District of Massachusetts, sitting by designation.

**ZOBEL, <u>District Judge</u>**.  Under the authority of the Magnuson-Stevens Act, 16 U.S.C. 1801, the Department of Commerce formulated a series of plans and regulations to protect the dwindling stock of groundfish in the Gulf of Maine.  These included closing certain areas to fishing.  Appellant, The Gulf of Maine Fishermen's Alliance ("GMFA"), is an association of commercial fishermen who have been severely impacted by the regulations and closures.  They challenged in the district court one such set of rules and plans known as "Framework 25"; they challenge in this court the district judge's dismissal of the case on mootness grounds.  We affirm.

Congress passed the Magnuson-Stevens Act in 1976 for the purpose of "promot[ing] domestic, commercial, and recreational fishing" while conserving precious fishing resources.  16 U.S.C. 1801(b)(1) and (3).  The Act established eight Regional Fishery Management Councils responsible for developing fishery management plans ("FMPs") in their regions.

The New England Fisheries Management Council (the "NEFMC") promulgated the first Northeast Multispecies Fisheries Management Plan in 1985 in an effort to curb the decline of groundfish stock in the Gulf of Maine.  Between 1985 and 1996, the Plan underwent a series of amendments as the groundfish population in that region continued to suffer.  Finally, in 1996, with the population of cod and other groundfish on the verge of collapse, the Commerce Department instituted a new "Framework" rulemaking procedure which allowed the regional regulatory authorities to amend inshore fishing regulations "at any time," thereby responding

-2-

more quickly to fluctuations in the groundfish population. Under this new, abbreviated procedure, the regional councils are able to adjust their fishing restrictions over the span of two regular monthly meetings, but they must provide timely public notice of any proposed change in regulations and invite public comment prior to and at the second meeting.

Framework 25, the first of the "Framework" regulations promulgated by the NEFMC, was developed in late 1997. Among other things, the regulation instituted a year-round closure of an inshore fishing area known as Jeffrey's Ledge, as well as a series of "rolling closures" along the Gulf of Maine which were intended to spread the impact of the fishing restrictions across several ports. These closures were to expire after three years.

On November 19, 1997, NEFMC mailed a notice to 1650 interested parties alerting them that Framework 25 would be discussed at the regular council meeting on December 9, 1997. The NEFMC also filed a meeting notice with the Office of the Federal Register on November 24, 1997, but it was not published until November 29, 1997, less than 14 days before the meeting date. Finally, on December 2, 1997, the NEFMC issued a press release about the declining groundfish stock, the proposed regulation, and the upcoming council meeting.

Several individual GMFA members did not receive notice of the meeting; however, most did, and representatives from GMFA attended the December 9, 1997 meeting. They objected to the proposed regulation on behalf of the GMFA members and presented a counterproposal which they claimed would achieve the same

-3-

conservation goals at a lower cost to inshore fishing fleets. The NEFMC considered their proposal, but chose to adopt its own version of Framework 25 at the next council meeting on January 14-15, 1998.

Soon thereafter, GMFA filed this suit to enjoin the enforcement of Framework 25. The group challenged the regulation on both procedural and substantive grounds, arguing that it should be set aside because (1) the NEFMC failed to comply with statutory notice and comment requirements, and (2) Framework 25 was not the best course of action available to achieve the stated conservation goals while minimizing the impact on small inshore fleets. Both parties moved for summary judgment and while these motions were pending, the NEFMC adopted Framework 27, a new FMP which expanded upon Framework 25 by increasing the size and duration of the rolling closures. On motion of defendant, the district court then dismissed the action challenging Framework 25 as moot. It ruled that the procedural failures that had occurred in the adoption of Framework 25 were not likely to be repeated, and that the substantive challenges, to the extent that they were still relevant after the adoption of Framework 27, could be reviewed in a case challenging that FMP

Framework 27 was adopted on May 5, 1999, after a notice and comment period which included two public hearings and timely publication in the Federal Register. GMFA filed a separate lawsuit challenging Framework 27 on substantive grounds, but did not contest the new regulation on procedural grounds because the notice and comment process had been sufficient.

Since 1999, the NEFMC has adopted several more FMPs. Two of these, Framework 31 and Framework 33, addressed and either modified or maintained the closures and groundfish trip limits in the Gulf of Maine and Jeffrey's Ledge, issues previously governed by Framework 25. GMFA does not contend that the NEFMC violated procedural rules in the adoption of these or any other FMP since Framework 25.

The questions before us are first, whether appellants' claims of invalidity are moot since Framework 25 is no longer in effect; and second, whether they fall within the narrow exception for claims that are "capable of repetition, yet evading review." S.Pac. Terminal Co. v. ICC. 219 U.S. 498, 515 (1911)."

We have consistently held that "a case becomes moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome of the controversy.'" Thomas R.W. v. Mass. Dept. of Educ., 130 F.3d 477, 479 (1st Cir. 1997) (quoting Boston and Me. Corp. v. Bhd. of Maintenance of Way Employees, 94 F.3d 15, 20 (1st Cir. 1996)).

A party can have no legally cognizable interest in the outcome of a case if the court is not capable of providing any relief which will redress the alleged injury. Thus, "if an event occurs while a case is pending ... that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the [action] must be dismissed." Church of Scientology v. United States, 506 U.S. 9, 12 (1992) (internal citations omitted). The promulgation of new regulations and amendment of old regulations

are among such intervening events as can moot a challenge to the regulation in its original form. Save Our Cumberland Mountains, Inc. v. Clark, 725 F.2d 1422, 1432 n.27 (D.C. Cir. 1984). ("There is no question that a case can be mooted by promulgation of new regulations or by amendment or revocation of old regulations."); see also Natural Res. Def. Council v. United States Nuclear Regulatory Comm'n, 680 F.2d 810, 813-815 (D.C. Cir. 1982)(procedural challenge to a regulation promulgated in violation of notice and comment requirements rendered moot by repromulgation of rule in accordance with procedural requirements).

Here, the appellant asks us to invalidate Framework 25, a regulation which is no longer in effect because it has been replaced by a series of subsequent Frameworks. This court has no means of redressing either procedural failures or substantive deficiencies associated with a regulation that is now defunct. In effect, those deficiencies have been eliminated by the promulgation of new Frameworks in compliance with the applicable procedural guidelines and based on new circumstances and data concerning the groundfish stock.

GMFA argues that the provision of Framework 25 which established a year-round closure at Jeffrey's Ledge is still in effect because it has not yet expired[1] and has not been modified by

---

[1] The Jeffrey's Ledge closure was originally scheduled to expire on May 1, 2001, three years after it was enacted as part of Framework 25, effective May 1, 1998. Our decision post-dates that expiration date. Given our conclusion that the provisions of Framework 25 at issue here were superceded by subsequent Frameworks, we need not consider whether the recent expiration of Framework 25 would provide an independent basis for our finding

-6-

subsequent Frameworks.  To the extent that this provision of Framework 25 is still operative, GMFA insists that we can declare it invalid.  Yet, the record is clear that the Jeffrey's Ledge closure, although unmodified since enacted in Framework 25, was expressly reconsidered and re-adopted in later Frameworks.  See, e.g., 64 Fed. Reg. 14846 (proposed Framework 27 fishing regulations); 64 Fed. Reg. 24066 (Framework 27 as enacted).  Therefore, the section of Framework 25 governing that closure is no longer in effect because fishing in Jeffrey's Ledge is now regulated by later Frameworks which, in turn, are based on later and totally different data.

Since every measure introduced in Framework 25, including the Jeffrey's Ledge closure, is now governed by a later Framework, no justiciable controversy exists regarding Framework 25, and the appellant's claims are moot.

There remains the second question, whether appellant's claims, although moot, may still be actionable because defendant's actions are, by their nature, "capable of repetition, yet evading review."  Weinstein v. Bradford, 423 U.S. 147, 149 (1975).  In order to qualify for this narrow exception to the mootness doctrine, a plaintiff must show that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation

_____

of mootness.  See, e.g., Roe v. Wade, 410 U.S. 113, 125 (1973) (explaining that "an actual controversy must exist at all stages of appellate . . . review, and not simply at the date the action is initiated")."

that the same complaining party would be subjected to the same action again."  Id; see also Thomas R.W., 130 F.3d at 479-480 (applying the Weinstein test).

GMFA argues that, under the Framework system, FMPs are developed and adopted in such rapid succession that it is impossible to challenge the validity of one Framework before the next one is put into effect.  The difficulty with the argument is that it is not supported by the facts.  GMFA has simply not shown that "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." Weinstein, 423 U.S. at 149.  New fishing regulations are not promulgated so quickly under the Framework system that all timely legal challenges are inevitably precluded.  The system does permit the NEFMC to adopt new fishing regulations within a matter of months; but, in practice, most Frameworks governing the Western Gulf of Maine closures (including Jeffrey's Ledge) are in place for as much as a year before being superceded by a new Framework.

At least one Framework regulation has already been fully litigated within that time frame.  Framework 33, published as a final rule on April 24, 2000, has governed the closure of Jeffrey's Ledge for almost two years.  One month after that Framework was enacted, a municipality affected by the closures filed a substantive legal challenge in which the appellant, GMFA, filed an amicus curae brief. City of Gloucester v. Mineta, No. 00-11019REK (D. Mass. Nov. 15, 2000).  The judge in that case recommended expedited review, and the litigation concluded less than six months

-8-

later. Thus, in only seven months, Framework 33 underwent a fully litigated substantive legal challenge.

Framework 25, the regulation at issue before us, was promulgated as a final rule on March 31, 1998, effective May 1, 1998, and was in force for more than a year before it was replaced by Framework 27 on May 5, 1999, affording appellant considerable time to pursue its claims. Furthermore, appellant never requested expedited review during this litigation. On the contrary, both parties sought numerous extensions of time for filing the administrative record, motions, and briefs. As a result of these delays, we cannot know whether GMFA might have obtained a judgment on its challenges to Framework 25 before the adoption of a subsequent Framework rendered those challenges moot. Given the actual, as opposed to theoretical, interval between most Frameworks and the historical fact that review is indeed possible, we decline to hold that Framework 25 was "too short in duration" to be fully litigated before its expiration.

Appellant fails as well to satisfy the second requirement of the Weinstein test. Neither the procedural nor the substantive deficiencies raised by appellant are likely to recur.

GMFA's procedural challenge to Framework 25 grew out of an admittedly insufficient notice and comment process during the promulgation of that regulation. Appellant urges that, absent some declaration by this court, the NEFMC's failure to adequately notify certain interested parties of the proposed rule, and the consequent inability of those parties to comment on the rule prior to its

-9-

adoption, could easily be repeated in the adoption of future Frameworks. Yet, GMFA concedes that the NEFMC has complied with the relevant notice and comment guidelines in adopting all subsequent Frameworks, and it has pointed to no evidence in the record which suggests that the procedural failures which occurred with respect to Framework 25 will be repeated. We thus affirm the District Court's determination that GMFA's objections to procedural deficiencies in the creation of Framework 25 are moot.

GMFA also challenges Framework 25 on substantive grounds; namely, that the closures it mandated disproportionately impact small inshore fleets. This defect in Framework 25, it contends, will be repeated in subsequent frameworks because each builds upon the closures and fishing limits established in prior ones. Thus is GMFA subjected to the same action by the NEFMC over and over. We disagree.

First, the later Frameworks do not depend on the provisions incorporated in Framework 25. They direct closures of different size, location and duration. These modified closures and limitations do not, therefore, constitute the "same action" with respect to appellants. The very purpose of the Framework system is to adjust the fishing regulations frequently so that no fleet or area bears the entire burden of the fishing limitations. GMFA represents several fleets, and those fleets have been impacted differently by each subsequent Framework. Because most of the limitations imposed by Framework 25 are not identical to the limitations imposed by later Frameworks, any mistakes in Framework

25 will not recur in the later ones.

Second, even the provisions of Framework 25 which remain unchanged in later Frameworks, such as the year-round closure at Jeffrey's Ledge, were re-adopted based on new, updated data concerning the groundfish stock. Thus, the later Frameworks do not subject the appellant to the same action because they involve an entirely new analysis. Assuming, *arguendo*, that the Jeffrey's Ledge closure in Framework 25 was found to be invalid as arbitrary and capricious under the strict standard set forth by the Administrative Procedure Act, 5 U.S.C. § 706 (1996), that does not mean that the same closure, as adopted in Framework 27 or any other Framework, was arbitrary and capricious based on the new data available to the NEFMC at the later time. Any substantive deficiencies in Framework 25 are thus not likely to be repeated.

We **AFFIRM** the District Court's dismissal of the appellant's claims as moot.