# United States Court of Appeals
## For the First Circuit

---

No. 03-1159

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD C. REID,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, Chief U.S. District Judge]

---

Before

Boudin, Chief Judge,
Lynch and Howard, Circuit Judges.

---

Owen S. Walker, with whom Elizabeth L. Prevett and the Federal
Defender Office were on brief, for appellant.

Gary S. Katzmann, Assistant U.S. Attorney, with whom Michael
J. Sullivan, U.S. Attorney, Gerard T. Leone, Jr., First Assistant
U.S. Attorney, and Timothy Q. Feeley and Colin Owyang, Assistant
U.S. Attorneys, were on brief, for appellee.

---

May 27, 2004

---

**LYNCH**, **Circuit Judge**.  On December 22, 2001, Richard Reid tried unsuccessfully to destroy American Airlines Flight 63 over the Atlantic Ocean by detonating explosives hidden in his shoes. The plane was diverted to Boston, where Reid was arrested.  On October 4, 2002, Reid pleaded guilty to eight terrorism-related offenses,[1] and on January 30, 2003, he was sentenced to serve the remainder of his life in prison.  At the sentencing hearing, Reid declared his continuing allegiance to the terrorist Osama bin Laden, adding: "I think I ought not apologize for my actions.  I am at war with your country . . . ."  A few days later, Reid was transferred from Massachusetts to a maximum security federal prison in Florence, Colorado (ADX Florence), where he remains today.

This interlocutory appeal[2] concerns the conditions of Reid's pre-sentence confinement.  Reid contends that the government violated his First Amendment rights by restricting his access to

---

[1] Reid pleaded guilty to attempted use of a weapon of mass destruction, 18 U.S.C. § 2332a(a)(1); attempted homicide, 18 U.S.C. § 2332(b)(1); placing an explosive device on board an aircraft, 49 U.S.C. § 46505; attempted murder, 49 U.S.C. § 46506(1) and 18 U.S.C. § 1113; two counts of interfering with an airline flight crew and attendants, 49 U.S.C. § 46504; attempted destruction of an aircraft, 18 U.S.C. § 32(a); and using a destructive device during and in relation to a crime of violence, 18 U.S.C. § 924(c).  The ninth count in the indictment -- attempted wrecking of a mass transportation vehicle, 18 U.S.C. § 1993(a) -- was dismissed by the district court.  See United States v. Reid, 206 F. Supp. 2d 132, 142 (D. Mass. 2002).

[2] Reid's challenge to his criminal conviction is the subject of a separate appeal to this court.  See United States v. Reid, No. 03-1198 (1st Cir. docketed Feb. 10, 2003).

news media while he was detained in Massachusetts. As a federal prisoner housed at the Massachusetts Correctional Institute at Cedar Junction, Reid was permitted to use funds from his prison account to purchase a subscription to _Time_ magazine. Under a set of "special administrative measures" imposed on Reid by the U.S. Marshals Service (USMS) at the direction of the Attorney General, an FBI special agent removed the "letters to the editor" section from each issue of _Time_ (the _Time_ letters) before giving the magazine to Reid. The special agent also clipped two articles about terrorism from the magazine and withheld them from Reid. Reid petitioned the district court for access to the withheld material on First Amendment grounds. After a hearing on January 21, 2003, the district court denied Reid's request.

We conclude this appeal has been overtaken by changes in the factual and legal circumstances of Reid's confinement. Although there remains a substantial dispute between the parties concerning Reid's access to _Time_, we nonetheless dismiss the appeal under the branch of the mootness doctrine barring courts from deciding a case when no practical consequences would flow from the decision.

**I.**

**A. Special Administrative Measures**

Reid challenges the "special administrative measures" (SAMs) that governed his confinement while in Massachusetts. The

Attorney General's power to promulgate SAMs for individual prisoners derives from 28 C.F.R. § 501.3 ("Prevention of acts of violence and terrorism"). See Yousef v. Reno, 254 F.3d 1214, 1219 (10th Cir. 2001). That regulation permits the Attorney General, who has plenary power over the management of federal prisons, see 18 U.S.C. § 4001(b), to impose on any individual prisoner "special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury." § 501.3(a). To impose such SAMs, the Attorney General or the head of any federal law enforcement or intelligence agency must certify that, with respect to the prisoner in question,

> there is a substantial risk that [the] prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

Id. Once authorized, SAMs may impose restrictions on the inmate's housing or privileges, including

> correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.

Id. The affected prisoner must be notified of the SAMs and the basis for their imposition. § 501.3(b).

SAMs are not indefinite in duration. Before the September 11, 2001 terrorist attacks, the risk assessment underlying a set of SAMs was deemed valid for 120 days; when that period expired, a new risk assessment had to be conducted before

the SAMs could be reimposed. Yousef, 254 F.3d at 1219; United States v. Johnson, 223 F.3d 665, 672 (7th Cir. 2000). After the September 11 attacks, the Bureau of Prisons amended § 501.3 to permit SAMs to remain in force for up to a full year with the approval of the Attorney General. § 501.3(c); see 66 Fed. Reg. 55062, 55062 (Oct. 31, 2001). The agency justified the extension by stating that the September 11 attacks had demonstrated "beyond question" that some terrorist conspiracies "are carried out over a long period--far in excess of 120 days." 66 Fed. Reg. at 55063. Though a prisoner might have limited ability to assist such efforts, the agency found, that fact "do[es] not diminish the urgent need for law enforcement authorities to curb the inmate's ability to participate in planning or facilitating those acts through communications with others within or outside the detention facility." Id.

## B. SAMs Imposed on Reid

In February 2002, approximately two months after Flight 63 landed in Boston, the Attorney General authorized the USMS to issue SAMs regulating Reid's pre-trial confinement. Cf. 28 C.F.R. § 501.3(f) (allowing branches of the Justice Department other than the Bureau of Prisons to issue SAMs for persons in their custody). After the district court objected to the initial version of Reid's SAMs, see United States v. Reid, 214 F. Supp. 2d 84, 92 (D. Mass. 2002), a new version was issued on June 19, 2002. It was under the

-5-

June 2002 SAMs that the USMS restricted Reid's access to Time magazine.

The June 2002 SAMs purported to control all of Reid's written and recorded communications, including his receipt of written materials. Under the caption "Inmate Communications Prohibitions," the document provided:

The inmate is prohibited from passing or receiving any written or recorded communications to or from any other inmate, visitor, or anyone else except as outlined and allowed by this document.

The SAMs then set forth detailed rules governing Reid's access to visitors, telephone calls, and legal, consular, and non-legal mail. Reid's Time subscription qualified as incoming non-legal mail:

**(Non-legal/Non-consular) Mail** - Any mail not clearly and properly addressed to/from the inmate's attorney and marked privileged, or consular mail (incoming or outgoing):

i.   **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

ii.  **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

...

iv.  **Mail Seizure** - If outgoing/incoming mail is determined by USMS or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of SAM, the mail shall not be delivered/forwarded. The inmate shall be notified in writing of the seizure of any mail.

These were the only provisions in the June 2002 SAMs pertaining to Reid's _Time_ subscription.

## C.  Reid's Motions for Access to _Time_

Reid initially challenged these restrictions in June 2002, when he indicated his intent to subscribe to _Time_ and filed a motion to prevent the government from interfering with the magazine's delivery.  Because Reid had not yet subscribed to _Time_, however, the district court denied the motion as not ripe.

Reid actually began subscribing to _Time_ in September 2002.  Initially, it appears, the magazine was delivered to him complete and without undue delay.  Then, on October 30, the government informed defense counsel that it had removed an article about terrorism from Reid's October 21, 2002 issue of _Time_ under the "Mail Seizure" provision of the SAMs.  Reid tried to challenge that decision through administrative channels, cf. 28 C.F.R. § 501.3(e) (providing that inmates subjected to SAMs may seek review through an administrative process), but the government successfully took the position that administrative remedies were unavailable to Reid, apparently because he had not yet been sentenced.

Reid responded by filing a renewed motion in the district court to enjoin the government from interfering with his _Time_ subscription.  He argued that government's censorship of his

subscription violated his First Amendment rights.  Reid also sought permission to purchase a radio, which was prohibited by the SAMs.

The government defended the SAMs and their application to Reid's Time subscription and radio request as reasonably necessary for valid penological and national security purposes.  The government justified this argument in part by reference to materials filed under seal.  Certain outbound correspondence from Reid had been seized during his confinement in Massachusetts.  The substance of that correspondence is not at issue in this case; the government submitted it simply to substantiate its claim (articulated in public) that Reid had indeed attempted to communicate with others while in custody.[3]  The government also emphasized that Reid is an admitted member of al Qaeda, a terrorist organization that, according to the government, trains its members to exploit "innocent-looking" communications to relay coded messages to and from prison in the event of capture.

On January 2, 2003, the district court held a hearing on Reid's motion.  As to the radio, the motion was denied, and Reid has not appealed that decision.  As to Time magazine, the court denied Reid's motion as moot after the government offered to give

---

[3] This sealed correspondence has not been made public.  The news media did appear at the January 21, 2003 hearing and move for access to the materials, and the district court required the government to submit an affidavit to support its assertion that national security considerations justified keeping the correspondence under seal.  That was done, and on January 28, 2003, the district court denied the motion.

Reid the only two Time articles it had yet seized under the SAMs.[4] The court agreed to be available on short notice if the government further interfered with Reid's access to the magazine.

Approximately one week later, Reid filed another motion concerning his Time subscription. He explained that the government had informed him after the January 2 hearing that (1) all further issues of Time magazine would be held by the USMS for thirty days before delivery, with the possibility that some terrorism-related materials would be withheld longer or even permanently, and that (2) all letters to the editor would be removed and withheld permanently. He again sought to enjoin the government from interfering with the complete and prompt delivery of the magazine.

A new hearing was scheduled for January 21. The government told the district court that withholding the Time letters was necessary to ensure that Time did not unwittingly become a vehicle for al Qaeda agents to convey coded messages to Reid in prison. The defense attacked that argument, pointing out that Time publishes only 2-3% of the letters it receives and that

_____

[4] The first article that the government seized was from the October 21, 2002 issue of Time. Entitled "Al-Qaeda: Alive and Starting to Kick Again," it described statements by Osama bin Laden and Ayman al-Zawahiri that were broadcast in early October 2002 on the al-Jazeera television network. The second, entitled "Why Can't We Find Bin Laden?," appeared in the November 25, 2002 issue of Time. That article, too, discussed a recorded statement issued by bin Laden. The government voluntarily gave both articles to Reid after the January 2, 2003 hearing, saying that delaying Reid's access to that material for thirty days was sufficient for the government's purposes.

those letters are subject to fact-checking and other editorial control.  The government responded that deleting the letters was a reasonable exercise of penological discretion under the SAMs because coded messages in the letters -- the possibility of which, the government said, could not be ruled out completely -- might provoke "outbursts" by Reid and might enable him to continue his criminal activities through outgoing correspondence.

The district court expressed some skepticism about the government's argument, observing:

> Mr. Reid is a very tall individual.  But he's not ten feet tall.  And this constant reiteration of we've got to keep data away from him, we've got to keep his data out of the hands of the public lest disaster befall, respectfully, is wearing a bit thin.

Nevertheless, the court denied Reid's motion on the ground that the SAMs permitted the restriction:

> I don't see any right that [Reid] has articulated to receive Time Magazine that would overcome the appropriate general concerns set forth in the SAMs.  I've respected the SAMs throughout. . . .  And while I see nothing wrong with letting him have Time Magazine . . . I see no right for him to have Time Magazine.

The court added that it was persuaded to rule for the government in part because of Reid's "ongoing intent" to harm the United States: "I make no bones about that.  This man shows an ongoing intent of hostility to the United States and I, I have that very much in mind."

Reid filed this interlocutory appeal on January 27, 2003.  Three days later, on January 30, Reid was sentenced to life in

-10-

prison, and on the following day he was committed to the custody of the Bureau of Prisons (BOP).  On February 4, 2003, the BOP transferred Reid from Massachusetts to ADX Florence, the maximum security facility in Colorado where he will serve his sentence.

## II.

On appeal, Reid asks this court to decide three questions:  (i) whether the June 2002 SAMs were procedurally invalid; (ii) whether those SAMs were unconstitutionally overbroad under the First Amendment; and (iii) whether the USMS's withholding of the Time letters under the June 2002 SAMs violated Reid's First Amendment rights.  The government defends the SAMs but also urges dismissal on a variety of grounds, including (1) that this court lacks appellate jurisdiction over Reid's interlocutory appeal, and (2) that this appeal has been mooted by events after the district court denied Reid's motion, including the expiration of the June 2002 SAMs and Reid's February 2003 transfer to ADX Florence.

For the reasons explained below, we conclude that Reid's appeal to this court is moot.  Accordingly, we do not reach the government's challenge to our appellate jurisdiction.  See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584-85 (1999) (jurisdictional issues may be addressed in any sequence); cf. Arizonans for Official English v. Arizona, 520 U.S. 43, 66-67 (1997) (court may assume without deciding that standing exists in order to analyze mootness).

-11-

Article III prohibits federal courts from deciding "moot" cases or controversies -- that is, those in which "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)); Gulf of Maine Fishermen's Alliance v. Daley, 292 F.3d 84, 87 (1st Cir. 2002). Mootness problems may arise at any point in a proceeding. "Even if an actual case or controversy exists at the inception of litigation, a case may be rendered moot (and, therefore, subject to dismissal) if changed circumstances eliminate any possibility of effectual relief." Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., 321 F.3d 9, 17 (1st Cir. 2003); see also Manqual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003). That is because, under Article III, federal courts have no authority to decide questions that cannot affect the rights of the litigants before them. Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990) (citing North Carolina v. Rice, 404 U.S. 244, 246 (1971)).

In lay terms, we recognize, it might be somewhat odd to describe Reid's claims in this case as "moot." Without a doubt, there is a substantial and continuing dispute between Reid and the government concerning his access to Time magazine. The government still has not turned over the Time letters that it seized; Reid

still demands access to those letters.  In that pragmatic sense, the controversy remains "live" and the parties adverse.

The problem is that even if this court decided the questions raised in Reid's appeal, the pragmatic dispute between the parties would be unaffected.  That is because the factual and legal circumstances surrounding Reid's case have changed so dramatically that Reid no longer asserts an injury that is "likely to be redressed by a favorable judicial decision" in this proceeding.  Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis, 494 U.S. at 477).  Any opinion on the merits of Reid's appeal to this court would be merely advisory.  Accordingly, we have no choice but to dismiss the case as moot.  See Mangual, 317 F.3d at 60 ("If events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case.").

We reach this conclusion for several reasons.  First, the June 2002 SAMs -- the regulations that Reid challenges on constitutional and procedural grounds -- are no longer in effect.  By regulation, those SAMs expired on June 19, 2003, one year after their adoption.  See 28 C.F.R. § 501.3(c).  No interest of Reid's would be served by invalidating them now:  the June 2002 SAMs no longer determine his conditions of confinement, and there is no claim for damages (actual or nominal) for Reid's alleged deprivations while those SAMs were still in effect.  Cf. Mr. & Mrs.

-13-

R., 321 F.3d at 17 (changed circumstances do not moot claims for money damages).  As we observed in the Daley case, which similarly involved an attack on a regulation that expired while the litigation was pending, "[t]his court has no means of redressing either procedural failures or substantive deficiencies associated with a regulation that is now defunct."  292 F.3d at 88.

Moreover, the BOP has imposed on Reid a new set of SAMs, effective August 14, 2003, at the ADX Florence facility in Colorado (the Colorado SAMs).  Unlike the June 2002 SAMs, the Colorado SAMs contain provisions specifically regulating Reid's access to the mass media.  The Time letters initially seized by the USMS in Massachusetts have been forwarded to ADX Florence, where the FBI has seized them anew under the mass media provisions of the Colorado SAMs.[5]  As a result, even an order from this court finding

_____

[5] In relevant part, the SAMs governing Reid's confinement at ADX Florence provide:

**Access to Mass Communications:**
To prevent the inmate from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

a.   **Periodicals/Newspapers -**
     ...
     ii.  Sections of the periodical/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the periodicals/newspapers prior to distribution to the inmate.

-14-

that the June 2002 SAMs were unconstitutional would not result in Reid's recovery of the seized _Time_ letters.  The Colorado SAMs -- the only basis for the government's continued withholding of the _Time_ letters -- are not before us.

Nor has Reid articulated any persuasive reason why this court should decide his appeal notwithstanding the expiration of the June 2002 SAMs and his transfer to ADX Florence.  This is not a case involving a defendant's _property_ interest in something taken by the government -- defense counsel made clear at oral argument that Reid is not interested in an order declaring that the _Time_ letters are his property and must be returned to his family or to his lawyer.  _Cf._ Fed. R. Crim. P. 41(g) (authorizing motions for the return of seized property).

Rather, Reid contends that this appeal is not moot because a judgment from this court would assist him in future litigation against BOP officials in Colorado. We disagree.  This is not an appeal in a civil case; it is an interlocutory appeal from the denial of a motion in a criminal prosecution.  If Reid were to prevail, his remedy would be simply the reversal of the district court's January 21, 2003 order.  Plainly, the Colorado SAMs would not be affected by our reversal of that order, which was predicated on the now-expired June 2002 SAMs and which the district

court itself did not believe would apply beyond the date of sentencing.[6]

Even aside from the question of available remedies, a victory for Reid in this appeal would not meaningfully assist him in challenging the conditions of his confinement at ADX Florence.[7] His procedural challenge to the June 2002 SAMs obviously has no bearing on the validity of the Colorado SAMs, which were separately promulgated. Likewise, even if Reid were to prevail in his substantive overbreadth challenge to the June 2002 SAMs, that would not determine the constitutionality of the Colorado SAMs. Reid's overbreadth argument is framed in terms of executive discretion: he says that mail seizure provisions of the June 2002 SAMs gave the USMS too much discretion to censor constitutionally protected speech. Unlike the June 2002 SAMs, however, the Colorado SAMs expressly cabin the discretion of prison officials to deny Reid

---

[6] During the January 21, 2003 hearing, the district court recognized its limited ability to affect Reid's access to Time magazine after sentencing: "Understand that at most I'm thinking of the time between now and the imposition of sentence. . . . Once he's sentenced I think that I would have little, if anything, to say about it. But in the interim maybe I have something to say."

[7] Of course, a favorable decision of any kind by this court might be useful to Reid for its precedential value, but the mere desire for a favorable precedent is not sufficient to prevent a case from becoming moot. Bd. of Educ. v. Ill. State Bd. of Educ., 79 F.3d 654, 659 (7th Cir. 1996); United States v. Fischer, 833 F.2d 647, 649 (7th Cir. 1987).

access to most mass media.[8]  So in any overbreadth attack on the Colorado SAMs, the judicial inquiry will be materially different.

Nor would a victory for Reid in his as-applied challenge to the June 2002 SAMs likely bear fruit in Colorado.  That is because the relevant legal question in any such First Amendment challenge is whether the restrictions imposed are "reasonably related to legitimate penological interests" under the circumstances.  Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (quoting Turner v. Safely, 482 U.S. 78, 89 (1987)).  If challenged, the reasonableness of the Colorado SAMs would be evaluated against the background of Reid's final conviction and sentence, not to mention the grave security considerations that attend the BOP's management of one of the nation's highest security prison facilities.[9]  See id. at 418 (one factor in evaluating the reasonableness of a prison restriction on incoming publications is the effect that accommodating the asserted constitutional right would have on order and security in the prison).  A judgment from this court invalidating the June 2002 SAMs, which were adopted in

_____

[8] The Colorado SAMs ensure Reid access to any "publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public."

[9] As the government noted at oral argument, Reid is not the only convicted terrorist held at ADX Florence.  See, e.g., Yousef v. Reno, 254 F.3d 1214, 1216-17 (10th Cir. 2001).

very different circumstances, would not significantly assist that inquiry.

Nor does Reid's appeal come under the exception to the mootness doctrine for cases "capable of repetition, yet evading review." S. Pac. Terminal Co. v. ICC, 219 U.S. 498, 514 (1911). That doctrine applies only where two circumstances are present: "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." Spencer, 523 U.S. at 17 (quoting Lewis, 494 U.S. at 481); see also Daley, 292 F.3d at 88-89.

If the problem in this case were simply that the one-year duration of the SAMs frustrated Reid's ability to obtain judicial review, the capable-of-repetition exception might apply.[10] But that is not the situation here. The Colorado SAMs are not the "same action" as the June 2002 SAMs; on the contrary, they impose substantively different restrictions and reflect new factual developments (i.e., Reid's conviction, sentencing, and transfer to a different prison facility). The June 2002 SAMs themselves are not reasonably likely to be repeated. Under these circumstances,

---

[10] But see Gulf of Maine Fishermen's Alliance v. Daley, 292 F.3d 84, 89 (1st Cir. 2002) (plaintiff failed to show that fishing regulations, though effective for only one year, could not be fully litigated within that time frame).

-18-

the capable-of-repetition exception is unavailable. See Daley, 292 F.3d at 90 (new regulation was not the "same action" for purposes of the capable-of-repetition doctrine because the new regulation was different in scope and based on new factual developments).

In sum, the factual and legal boundaries of the parties' dispute have changed so completely since the district court's January 21, 2003 order that any decision by this court on the issues raised in Reid's appeal would be essentially irrelevant. Reid may still be aggrieved by the government's conduct, but as to the district court order that is the subject of this appeal, Reid lacks "a particularized, concrete stake that would be affected by our judgment." Lewis, 494 U.S. at 479. Accordingly, this appeal is moot and must be dismissed. See id.; Mangual, 317 F.3d at 60; Daley, 292 F.3d at 88.

If Reid still wishes to challenge the government's continued withholding of the Time letters, he may do so by whatever procedures are available to him in Colorado, including any required administrative review. Cf. 42 U.S.C. § 1997e(a); 28 C.F.R. § 501.3(e). Although Reid has expressed concern that the outcome of the present litigation may somehow prejudice him should he choose to file a new action in Colorado, we see no prejudice. Our mootness holding depends on our conclusion that the June 2002 SAMs have expired and have no continuing effect. And to ensure that Reid suffers no adverse consequences from the district court's

-19-

January 21, 2003 order, we will vacate it.  See <u>United States</u> v. <u>Munsingwear, Inc.</u>, 340 U.S. 36, 39-41 (1950) (noting that the standard practice in cases that become moot on appeal is to vacate the judgment below).

### III.

The appeal is **dismissed** and the district court order below is **<u>vacated</u>**.  **<u>So ordered</u>**.