ASSOCIATED FISHERIES OF
MAINE, INC., Plaintiff,

v.

Donald L. EVANS, Secretary of the
United States Department of
Commerce Defendant.

No. 04–CV–108–P–S.

United States District Court,
D. Maine.

Dec. 21, 2004.

248

H. Reed Witherby, Smith & Duggan, LLP, Boston, MA, Kate S. Debevoise, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Associated Fisheries of Maine, Inc.

Adam Issenberg, U.S. Department of Justice, Environmental & Natural Resources Div, Benjamin Franklin Station, Washington, DC, Coby H. Howell, U.S. Department of Justice, Environmental & Natural Resources Div, Benjamin Franklin Station, Washington, DC, for Secretary of U.S. Department of Commerce.

Gary C. Wood, City of Portland, Portland, ME, for City of Portland.

## ORDER

SINGAL, Chief Judge.

Before the Court is Plaintiff's Motion for Summary Judgment (Docket # 35) and Defendant's Cross Motion for Summary Judgment (Docket # 42). After reviewing the parties' submissions, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross Motion for Summary Judgment for the reasons explained below.

Plaintiff Associated Fisheries of Maine ("AFM") brought this suit against Secretary of Commerce Donald Evans challenging the validity of the final rule enacting Amendment 13 to the Northeast Multispe-

cies Fishery Management Plan ("Amendment 13"). Specifically, AFM argues that the Secretary violated both the Magnuson–Stevens Act, 16 U.S.C. §§ 1801 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–704, 706, by substantively altering the final rule without the authorization of the New England Fishery Management Council ("the Council") and without providing the public with an opportunity to comment on the change. The Government, for its part, concedes that the final rule is "procedurally infirm" but urges the Court to find Plaintiff's claims to be moot in light of an interim final rule ("IFR") issued on December 8, 2004, which, according to the Government, cures the alleged defects. In a telephone conference with the Court on December 10, 2004, Plaintiff declined to amend its summary judgment motion to more directly address the impact of the IFR and asked the Court to rule on the merits of the case as it is currently briefed.

## I. BACKGROUND

### A. The Regulation of New England Fisheries

This case involves the sensitive balance between the long-term protection of New England's threatened groundfish stocks and the livelihoods of New England's fishermen. Congress has created an elaborate mechanism to weigh these competing interests in the Magnuson–Stevens Act, 16 U.S.C. § 1801 et seq. In this act, Congress created eight regional fishery management councils and gave them primary responsibility for establishing fishery management plans ("FMPs") to regulate fishing in their regions. Congress also delegated power to the Secretary of Commerce ("the Secretary"), through the National Marine Fisheries Service ("NMFS"), to ensure that the FMPs drafted by the Councils were in compliance with ten na-

tional standards set out by the Act, see 16 U.S.C. § 1851, as well as other applicable law. See 16 U.S.C. § 1854(a)(3). These standards included the prevention of overfishing and the minimization of adverse economic impacts on fishing communities. See 16 U.S.C. § 1851. In 1996, in response to growing concerns about the depletion of fish stocks, Congress passed the Sustainable Fisheries Act, Pub.L. No. 104–297, 110 Stat. 3559 (codified as amended in scattered sections of 16 U.S.C.), which made prevention of overfishing a priority and gave greater powers to the Secretary to ensure that the regional councils addressed overfishing problems in an adequate and timely manner.

New England fishermen have been unquestionably hard-hit in recent years by increasingly restrictive FMP amendments, framework adjustments and IFRs implemented by the Council and NMFS in an attempt to restore New England's dangerously low ground fish stocks to sustainable levels. The Council and NMFS have pursued a strategy of reducing overfishing by limiting the number of days that each fishing vessel may spend at sea. In 1996, Amendment 7 to the Northeast Multispecies (Groundfish) FMP restricted the number of days at sea ("DAS") allocated to each fishing vessel to 65 percent of its historical average. In 1997, the DAS allocations were reduced to 50 percent of historical average. Successful litigation by environmental groups in 2001 over continued overfishing of certain groundfish led to a settlement agreement in which the Government pledged to restrict fishing even further. See Conservation Law Found. v. Evans, 209 F.Supp.2d 1 (D.D.C.2001). An IFR issued by the Secretary in 2002 pursuant to that settlement agreement further reduced each vessel's allocation of DAS to 80 percent of its allocation under Amendment 7.

Amendment 13, the subject of the current litigation, represents the Council's efforts to replace the IFR issued by the Secretary in 2002 with a permanent solution. Amendment 13 allocates DAS to fishing vessels for fishing year ("FY") 2004[1] by determining a "DAS baseline" based on the historical fishing efforts of each vessel. That DAS baseline is then reduced by 40 percent to obtain the FY 2004 DAS allocation for each vessel. It is the calculation of the DAS baseline that is at issue in this litigation.

## B. The Challenged Regulations

The crux of AFM's complaint is that the Secretary approved the relevant portion of Amendment 13 as submitted by the Council but then issued implementing regulations that, in Plaintiff's view, significantly altered the Council's method for calculating the DAS baseline. Furthermore, the Secretary inserted the change directly into the final rules, bypassing the notice and comment process and depriving the public of any opportunity to comment on the change.

As noted above, the Magnuson–Stevens Act gives the regional councils the power to draft FMPs and FMP amendments. *See* 16 U.S.C. § 1852(h). When the council submits an FMP amendment, such as Amendment 13, to the Secretary, he may only "approve, disapprove, or partially approve" the amendment. 16 U.S.C. § 1854(a)(3). Furthermore, the Secretary may only disapprove or partially approve a

plan or amendment if the plan or amendment is "inconsistent" with "the applicable law." *Id.* If the Secretary approves a plan, he may promulgate regulations, subject to the notice and comment provisions of the APA (5 U.S.C. § 553), "as may be necessary" to carry out any FMP or amendment. 16 U.S.C. § 1855(d).

As proposed by the Council, the DAS baseline—the starting figure to which the 40 percent reduction in DAS is applied—would have been the highest number of DAS actually used by each vessel in any individual fishing year between 1996 and 2001. This calculation ensures that the entire fishing industry shares the burden of DAS reductions by requiring all vessels to reduce their *actual* fishing efforts, even vessels that historically have not used up their DAS allocations.

Although the Secretary only "partially approved" Amendment 13 under 18 U.S.C. § 1854(a)(3), he explicitly approved the Council's method of calculating the DAS baseline. The Secretary's proposed rules implementing Amendment 13 also incorporated the Council's DAS baseline.[2] *See* Notice of Proposed Rule Making, 69 Fed. Reg. 4362, 4415 (Jan. 29, 2004). However, when the Secretary issued his final rules in April 2004, he inserted an additional limitation into the DAS baseline calculation. Although the DAS baseline was still based on the highest number of DAS fished between 1996 and 2001, the DAS baseline was also "not to exceed the vessel's annual

---

**1.** A fishing year runs from May 1 of the year it is named for through April 30 of the following year. Thus, FY 2004 ends on April 30, 2005.

**2.** The language submitted by the Council, as proposed by the Secretary reads:

*Calculation of used DAS baseline.* For all valid limited access NE multispecies DAS vessels ... a vessel's used DAS baseline shall be based upon the fishing history associated with its permit and shall be deter-

mined by the highest number of reported DAS fished during a single qualifying fishing year ... during the 6–year period from May 1, 1996, through April 30, 2002. A qualifying year is one in which a vessel landed 5,000 lb (2,268 kg) or more of regulated multispecies.

Notice of Proposed Rule Making, 69 Fed.Reg. 4362, 4415 (Jan. 29, 2004).

allocation prior to August 1, 2002." Final Rule, 69 Fed.Reg. 22,906, 22,970–71 (Apr. 27, 2004).[3] In other words, with the Secretary's alteration, each vessel's allocation of DAS in FY 2001 would serve as a cap on the calculation of its historical fishing effort.[4] This restriction is significant because the DAS allocation formula was significantly more generous in 1996 than it was in 2001. Vessels that used most or all of their comparatively large 1996 DAS allocations would likely see their DAS baseline reduced substantially as a result of the inserted cap. Plaintiff provides the example of the *F/V Olympia*, which would see its DAS baseline reduced from 205 to 158 as a result of the cap. (*See* Pl.'s Statement of Undisputed Facts (Docket # 36), at ¶ 58.) Applying the 40 percent reduction, the *F/V Olympia* would be allocated only 95 DAS with the cap, in contrast to 123 DAS under the original plan submitted by the Council. (*Id.*) Plaintiff states that the harm to the *F/V Olympia* resulting from the inserted cap is representative of the majority of its harvesting members. (*Id.*) For its part, the NMFS confirms that removing the cap would have a substantial impact on the fishing fleet, predicting an 8.9 percent overall increase in DAS alloca-

tions if Plaintiff prevails. (*See* Def.'s Statement of Undisputed Facts (Docket # 43), at ¶ 32.)

The Secretary argues that the omission of the cap from Amendment 13 was the result of a "clerical error" by the Council (*Id.* at ¶ 26), and characterizes his insertion of the cap into the final rule as an effort to "clarify" the Council's proposal. Final Rule, 69 Fed.Reg. 22,906, 22,906 (Apr. 27, 2004). The Secretary points to several facts that imply such an error, including the presence of the cap in early drafts of the amendment and its subsequent disappearance without a motion or recorded debate by any council members (*see* Def. Statement of Undisputed Facts, at ¶¶ 24–28), environmental impact analyses undertaken by the Council and NMFS after the cap was dropped that assumed the cap was still in place (*see id.* at ¶¶ 30–31), and recent action by the Council to incorporate the cap into an upcoming Framework Adjustment that is likely to govern DAS allocations for FY 2005. *See* Final Interim Rule, 69 Fed.Reg. 70,919, 70,921 (Dec. 8, 2004). In addition, the Secretary argues that it would be inconsistent with the goals of Amendment 13 to

3. The final rule issued by the Secretary reads: *Calculation of used DAS baseline.* For all valid limited access NE multispecies DAS vessels ... a vessel's used DAS baseline shall be based upon the fishing history associated with its permit and shall be determined by the highest number of reported DAS fished during a single qualifying fishing year ... during the 6–year period from May 1, 1996, through April 30, 2002, *not to exceed the vessel's annual allocation prior to August 1, 2002.* A qualifying year is one in which a vessel landed 5,000 lb (2,268 kg) or more of regulated multispecies. Final Rule, 69 Fed.Reg. 22,906, 22,970–71 (Apr. 27, 2004) (emphasis added). .

4. In a separate count, Plaintiff alleged in its complaint that the Secretary is misinterpreting the phrase "prior to August 1, 2002" in

the regulations. The Secretary apparently indicated to Plaintiff that this phrase could refer either to the vessel's allocation of DAS in 2001, or, alternatively, the vessel's allocation of DAS in the year between 1997 and 2001 in which the vessel had the highest number of DAS fished. Plaintiff initially argued that this phrase should be interpreted as encompassing 1996 DAS allocations, which would give Plaintiff's members the benefit of 1996's substantially more generous DAS allocation formula. However, Plaintiff is no longer pressing this misinterpretation claim. (Pl.'s Objection to Def.'s Cross Mot. for Summ. J. (Docket # 47), at 11 n.12.) Therefore, without expressing a view as to the plausibility of the Secretary's alternative interpretation, the Court will assume that the cap refers to the 2001 DAS allocation.

allow for DAS baselines that exceed recent historical allocations. *Id.* at 70,923.

For its part, Plaintiff argues that whatever the Council may have intended, the final language of Amendment 13 is unambiguous in not including the cap. Therefore, principles of both statutory interpretation and administrative procedure dictate against examining the Council's subjective intent. Plaintiff has also submitted an affidavit by a Council member suggesting that the omission of the DAS cap was not a mere clerical error but the result of a compromise to accommodate different groups of fishermen. (*See* Stevenson Aff. (Docket # 49), at ¶ 14–15.)

## C. The Interim Final Rule ("IFR")

After Plaintiff commenced the present litigation, the Secretary conceded that inclusion of the DAS cap was procedurally infirm, (*see* Def. Cross Mot. for Summ. J. (Docket # 42), at 1) and sought to moot Plaintiff's claims by reissuing the DAS baseline provision under his interim rule-making power. Section 305(c)(1) of the Magnuson–Stevens Act provides that "if the Secretary finds … that interim measures are needed to reduce overfishing for any fishery, he may promulgate … interim measures necessary to address the … overfishing." 16 U.S.C. § 1855(c)(1). Interim rules may remain in effect for 180 days and may be extended for an additional 180 days if the public is given an opportunity to comment on them. 16 U.S.C. § 1855(c)(3)(B). NMFS issued the proposed interim rule—a verbatim recital of the challenged DAS baseline provision—on October 28, 2004 and invited public comment on it. *See* Proposed Interim Rule; Request for Comments, 69 Fed.Reg. 62,-844. Public comments were accepted until November 12, and NMFS issued the interim final rule along with the agency's responses to the comments on December 8,

2004. *See* Final Interim Rule, 69 Fed.Reg. 70,919. NMFS declined make any changes to the proposed rule as a result of the comments.

Meanwhile, the parties' cross motions for summary judgment were taken under advisement by the Court on November 17, 2004. The Secretary argued in his motion for summary judgment that the expected finalization of the interim rule would render Plaintiff's claims constitutionally moot, and that even prior to the issuance of the IFR the doctrine of prudential mootness counseled against granting relief to the Plaintiff. Plaintiff had filed its summary judgment motion prior to the publication of the proposed interim rule, but devoted a large portion of its response to the Government's summary judgment motion to refuting the Government's argument that the case was prudentially moot even before the IFR was published. Plaintiff also argued that finalization of the proposed interim rule will not render its claims constitutionally moot and suggested that the Secretary may not even have the power to issue interim rules that contravene FMP amendments submitted by the Council and approved by the Secretary.

Given the significant change in circumstances brought about by the publication of the IFR, the Court held a telephone conference with counsel in which it inquired how the parties wished to proceed in light of the IFR. The Court stated that it was prepared to rule quickly on the original cross motions for summary judgment, but it was also willing to consider allowing the parties to amend their filings to more adequately brief the legal issues raised by the IFR. Plaintiff stated that, given the Court's willingness to rule quickly, it would prefer the Court to rule on whether its initial claims are moot rather than delaying a decision with further briefing. The Government also indicated its

preference for a ruling on the original motions. The Court now issues this order pursuant to the understanding reached during the conference.

## II. DISCUSSION

The Court is troubled by the Government's clear and inexplicable failure to comply with the procedural requirements of both the Magnuson–Stevens Act and the APA in promulgating the final rule implementing Amendment 13. However, as discussed in this section, precedent dictates that procedural challenges to a rule are constitutionally moot if the rule is replaced during the course of the litigation. Therefore, without endorsing the propriety or, for that matter, the legality of the Government's end-run around the Council process through its use of the interim rulemaking power, the Court is obliged to find Plaintiff's claims against the final rule as promulgated in April 2004 to be constitutionally moot.

## A. The April 2004 Final Rule

As the Government has conceded in both its court filings and the Federal Register, the final rule promulgated in April was "procedurally infirm" and unlikely to have withstood a court challenge. First, the Secretary clearly exceeded the scope of his limited rulemaking authority under the Magnuson–Stevens Act. Although the Act gives the Secretary certain powers that allow him to influence policy,[5] he is generally obliged to implement and enforce the management plans and amendments designed by the regional councils. The Secretary is even more constrained

once he has approved an FMP or amendment proposed by a council. The Magnuson–Stevens act charges the Secretary with the responsibility "to carry out any fishery management plan or amendment approved ... by him." 16 U.S.C. 1855(d). He may issue implementing regulations only "as may be necessary to discharge such responsibility." *Id.*

In this case, the Secretary significantly altered the unambiguous language of Amendment 13 as proposed by the Council and approved by him. The removal of the DAS cap, by the Government's own admission, would result in a substantial increase in the total DAS allocated to the fishing fleet. (*See* Def. Cross Mot. for Summ. J. at 12.) Such a major change cannot plausibly be considered minor or technical, nor can it be characterized as a "clarification" given the utter lack of ambiguity in the Council's language. In addition, the question of whether or not the omission of the cap was a "clerical error," as suggested by the Secretary, does not alleviate the procedural problem. Even if the omission was accidental, the Secretary can point to no provision in the Magnuson–Stevens Act suggesting that he may fix such an error sua sponte without any action by the Council. Indeed, the statutory scheme, taken as a whole, strongly suggests that while Congress wished the Secretary to have the power to prod the Council to remedy mistakes or address issues, it generally left the power to craft solutions to the Council itself.

■ Second, the Secretary's insertion of the DAS cap into the final rules may also

---

5. These powers include a veto power over FMPs and amendments proposed by a council when they fail to comply with Act's standards for fishery management or other applicable law, 16 U.S.C. § 1854(a), the power to prepare FMPs and amendments when a council fails to do so, 16 U.S.C. § 1854(c), the power

to force a council to draft an FMP, amendment or regulations to address overfishing after a finding by the Secretary that overfishing is occurring, 16 U.S.C. § 1854(e), and a limited power to enact stopgap measures to address emergencies or overfishing, *see* 16 U.S.C. § 1855(c).

violate the notice and comment provisions of the APA by depriving the public of the opportunity to comment on the cap. The notice and comment provision of the APA requires the agency to give "interested persons the opportunity to participate in the rule making." 5 U.S.C. § 553. Significant changes to a rule after the comment period can deprive the public of meaningful participation in the rulemaking process. Thus, the First Circuit has held that changes to final regulations "must flow logically from the prescribed notice and comment." *O'Connell v. Shalala*, 79 F.3d 170, 180 (1st Cir.1996). Changes that are not "in character with the original scheme" or a "logical outgrowth of the notice and comment" should be remanded to the agency for additional public comment. *Natural Resources Defense Council v. EPA*, 824 F.2d 1258, 1283 (1st Cir.1987). This inquiry "always requires careful consideration on a case-by-case basis"—an inquiry that the Court will not undertake here since, as discussed below, Plaintiff's claim is moot. *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 642 (1st Cir.1979). Nevertheless, given the absence of the DAS cap in the proposed regulations and the absence of any comments about it by the public, the Court is doubtful that the DAS cap could be defended as a logical outgrowth of the notice and comment process.

## B. The Effect of the IFR

Although Plaintiff suggests that the final interim rule promulgated by the Secretary on December 8, 2004 raises its own questions of legal viability, those issues are not properly before the Court. Plaintiff has brought a procedural challenge against the original rule promulgated by the Secretary in April 2004, and that challenge became moot when the new rule took effect. Neither the fact that the new rule is identical to the old rule nor the fact that the new rule raises similar questions about the Secretary's authority to act without council approval alters the Court's conclusion.

 Article III prohibits federal courts from deciding case or controversies that have been rendered moot by subsequent events. *United States v. Reid*, 369 F.3d 619, 624 (1st Cir.2004). Courts must find a case moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome of the controversy." *Thomas R.W. v. Mass. Dept. of. Educ.*, 130 F.3d 477, 479. "A party can have no legally cognizable interest in the outcome of case if the court is not capable of providing any relief which will redress the alleged injury." *Gulf of Me. Fishermen's Alliance v. Daley*, 292 F.3d 84, 88 (1st Cir.2002) Furthermore, "[e]ven if an actual case or controversy exists at the inception of litigation, a case may be rendered moot (and, therefore, subject to dismissal) if changed circumstances eliminate any possibility of effectual relief." *Me. Sch. Admin. Dist. No. 35 v. R.*, 321 F.3d 9, 17 (1st Cir.2003)

The First Circuit dealt with a similar mootness question involving new fishery rules released during a legal challenge in *Gulf of Maine Fishermen's Alliance v. Daley*, 292 F.3d 84 (1st Cir.2002). In that case, a fishermen's association challenged a set of regulations issued by the New England Council known as Framework 25. These regulations instituted a series of "rolling closures" of fishing areas throughout New England in an effort to protect collapsing stocks of cod and other groundfish. *Id.* at 86. In response to the regulations, the fishermen's association sued the Secretary, challenging Framework 25 on both procedural grounds for failing to provide adequate notice and comment and substantive grounds for ignoring alternatives that would have imposed fewer costs

on fishermen. However, while motions for summary judgment on Framework 25 were pending before the District Court, a new FMP, known as Framework 27, was issued by NMFS. Framework 27 "expanded upon Framework 25 by increasing the size and duration of the rolling closures." *Id.* at 84. Despite the fact that Framework 27 was apparently even more harmful to the plaintiff than Framework 25, the district court found, and the First Circuit affirmed, that the plaintiff's challenge to Framework 25 was mooted by the intervening regulation.

In ruling that the fishermen's challenge was moot, the First Circuit affirmed that "the promulgation of new regulations and amendment of old regulations" can render challenges to the original regulations moot. *Id.* at 88 (citing *Save Our Cumberland Mountains, Inc. v. Clark*, 725 F.2d 1422, 1432 n. 27 (D.C.Cir.1984); *Natural Resources Defense Council v. Nuclear Regulatory Comm'n*, 680 F.2d 810, 813–815 (D.C.Cir.1982)). The court went on to hold that it had "no means of redressing either procedural failures or substantive deficiencies associated with a regulation that is now defunct." *Id.* Even provisions of Framework 25 that had "not yet expired and [had] not been modified by subsequent Frameworks" were moot since the record was clear that the provision "was expressly reconsidered and re-adopted in later Frameworks." *Id.*

█ There is little to distinguish *Gulf of Maine Fishermen's Alliance* from the case before the Court. The Secretary's IFR "amend[s]" the DAS baseline provision as published in 50 C.F.R. § 648.82 by "republish[ing]" the challenged language. Final Interim Rule, 69 Fed.Reg. 70,919, 70,923 (Dec. 8, 2004). Thus, the challenged DAS baseline provision in the April 2004 rules is no longer operative, even though the provision replacing it is identical in every substantive respect. Like the provisions in *Gulf of Maine Fishermen's Alliance* that went unmodified between Framework 25 and 27, the DAS cap was "expressly reconsidered and re-adopted" by the Secretary in the IFR. 292 F.3d. at 88. Under these circumstances, a ruling for Plaintiff that the April 2004 regulation is procedurally infirm would provide it with no meaningful relief.[6]

Plaintiff protests that even if the IFR moots their notice and comment claim by providing an opportunity for public comment on the DAS cap, it does not resolve Plaintiff's claim that the Magnuson–Stevens Act prohibits the Secretary from making changes to FMPs and amendments without Council approval. The Court agrees that the IFR raises the same *general* concern that the Secretary is exceeding his delegated powers in a statutory scheme that vests most policy-making authority in the regional councils. However, the Secretary's authority to promulgate interim measures to reduce overfishing is legally and historically distinct from his power to issue rules to implement FMPs and amendments.[7] Even if the Secretary lacked the power to insert the DAS cap using his rulemaking authority in § 1855(d), he may well be permitted to

---

6. By the same token, if Plaintiff were to successfully challenge the IFR at some later date, the DAS cap would fail. The Secretary could not fall back on the April 2004 final rule.

7. Congress only recently granted the Secretary the power to implement interim rules to reduce overfishing in the Sustainable Fisheries Act of 1996, P.L. 104–297, 110 Stat. 3559 (codified as amended in scattered sections of 16 U.S.C.). This bill seems to have been motivated in part by concern that some of the regional councils were not acting quickly enough to reduce overfishing. *See* Cong. Rec. Daily Digest, S10906, at S10910 (Sept. 19, 2004) (statement of Sen. Chaffee).

make the same alteration using his interim rulemaking authority in § 1855(c).[8] The fact that the two rules are textually identical is irrelevant in the context of a challenge concerned primarily with the Secretary's power to issue the regulations.

 Plaintiff also suggests that even if the mootness doctrine would otherwise apply, the procedural problems with the April 2004 final rule may be "capable of repetition yet evading review." *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). This exception to the mootness doctrine requires Plaintiff to show that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). A "reasonable expectation" or "demonstrated probability" that the same controversy will recur involving the same complaining party is necessary to satisfy this test. *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). "[A] mere physical or theoretical possibility" is not sufficient. *Id.*

In this case, the Government has admitted in both its summary judgment motion and the Federal Register that its insertion of the cap in the April 2004 final rule was procedurally infirm. It is highly improbable that the Government would have made such an admission if it intended to continue the practice of either substantially altering Council amendments while in the process of implementing them or changing proposed rules to deprive the public of a meaningful opportunity to comment on them. Repetition of these challenged practices would invite further litigation in which the Secretary would be at a significant disadvantage due to his admission in this case. Furthermore, the Magnuson-Stevens Act gives the Secretary the power to force the Council to remedy any overfishing that he finds to be occurring. *See* 16 U.S.C. § 1854(e). The Court thinks it unlikely that the Secretary would again resort to a procedure that he has disavowed when he has a perfectly legal alternative that will produce nearly the same result. Thus, without any evidence in the record suggesting otherwise, the Court finds that there is no reasonable expectation that the specific procedural infirmities alleged by Plaintiff will be repeated.[9]

## III. Conclusion

For the reasons stated above, Plaintiff's claim that the April 2004 final rule implementing the DAS baseline was invalid has been mooted by the Secretary's superseding interim rule. Furthermore, the procedural infirmities that afflicted the April

8. § 1855(c) does contain its own limits on the Secretary's discretion, most obviously a requirement that the Secretary find such interim measures are "needed to reduce overfishing." However, an inquiry into the Secretary's compliance with the distinct requirements of § 1855(c) is well outside the scope of Plaintiff's claims and, furthermore, would require the Court to review an administrative record that is not currently before it.

9. The fact that the Secretary chose to remedy the problem in a way that Plaintiff believes to be procedurally invalid (i.e., through the interim rulemaking power) does not alter this analysis, even if there is a reasonable expectation that the Secretary will use his interim rulemaking power in this way again. As noted above, the legal issues raised by the Secretary's use of the interim rulemaking power are not before the Court. The Court may only treat Plaintiff's claim as a live controversy if it finds that the procedural infirmities *alleged in the complaint* are "capable of repetition yet evading review." *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

2004 rule are not subject to the mootness doctrine's exception for claims that are "capable of repetition yet evading review." On this basis, the Court DENIES Plaintiff's motion for summary judgment and GRANTS the Government's cross motion for summary judgment.

SO ORDERED.